UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                         CRIMINAL NO.  11-280 (MJD/JSM)

      Plaintiff,

v.                                                                   <u>REPORT AND RECOMMENDATION</u>

TODD ALLEN MUDGETT (12),

      Defendant.

      JANIE S. MAYERON, United States Magistrate Judge

The above matter came on for hearing before the undersigned upon defendant Todd Allen Mudgett's Motion to Suppress Statements and Evidence [Docket No. 499]. Assistant United States Attorney Steven L. Schleicher appeared on behalf of the Government; Lee R. Johnson appeared on behalf of Todd Allen Mudgett who was present at the hearing.  Special Agent Shawn Harris and Minnesota State Trooper Scott Schneider testified on behalf of the Government; private investigator Warren John Robinson testified on behalf of defendant.  The parties agreed that the evidence previously adduced at the hearing on November 30, 2011, including testimony and exhibits placed into evidence, constituted substantive evidence in the instant matter. <u>See</u> Docket No. 445 (transcript of November 30, 2011 hearing, Gov't Exs. 1-14, 16-29, 35-47; Defendants' Exs. A-E.)

The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

## I.      FACTUAL BACKGROUND

Defendant Todd Allen Mudgett is seeking to suppress evidence seized at a traffic stop on August 8, 2011, and statements made by him during the course of that stop.

DEA Special Agent Shawn Harris testified that prior to the traffic stop of Mudgett on August 8, 2011, he knew defendant Jose Oceguara was involved in a drug trafficking organization as a multi-pound methamphetamine distributor with a distinct customer base.  February 7, 2012, Hearing Transcript ("Tr.") [Docket No. 520] 7.  Agent Harris also knew that defendant Jose Ramirez-Valdovinos had been identified as one of Oceguara's alternative sources for methamphetamine when issues of supply and price arose.  Tr. 7-8.

Agent Harris testified that on May 19, 2011, officers had conducted surveillance of a controlled buy of four ounces of methamphetamine between a confidential source and defendant Javier Hernandez-Coria.  Tr. 8-9.  They followed Hernandez-Coria to a restaurant in St. Paul where he met up with Oceguara and some of his associates and then observed them drive in tandem to an apartment complex located on McCarrons Boulevard[1] in Roseville.  Tr. 9.  These individuals stayed for two minutes and then left. Tr. 9.  Officers continued surveillance on Oceguara who appeared to run errands and returned to the apartment complex on McCarrons Boulevard about an hour later where Hernandez-Coria waiting.  Tr. 9.  Oceguara and Hernandez-Coria spoke for a minute and then Hernandez-Coria left the area.  Tr. 9.  Based on these observations, agents

---

[1]       Officers believed that Mudgett lived at the apartment complex.  Tr. 20-21.

2

believed that a drug transaction had taken place, but they were unsure who was receiving the payment for the drugs and who was receiving the drugs.  Tr. 9-10.

Agent Harris's testimony then turned to Mudgett.   Prior to the traffic stop of Mudgett on August 8, 2011, Agent Harris testified that based on analysis of telephone toll records, officers knew that a phone subscribed to Mudgett had frequent calls to and from a phones used by Oceguara, which led officers to believe that Mudgett was potential customer of Oceguara.  Tr. 10.  On July 29, 2011, officers intercepted five telephone conversations between Mudgett and Oceguara.  Tr. 11.   The officers concluded that Mudgett and Oceguara were discussing through coded language how much money Mudgett had and an agreement to meet later that day for a drug transaction.  Tr. 11, 18-19.

During the last intercepted conversation between Oceguara and Mudgett on July 29, 2011, there was a discussion that Mudgett owed $300 for a drug transaction that had occurred a week earlier.  Tr. 12, 29-30.  In that phone call, using coded language, they talked Mudgett getting about $13,000, $14,000 or $15,400.  Tr. 14, 29.  Mudgett explained that the reason he was short was he had a friend that was getting out of jail, and once that happened, he would be able to get the full amount owed.  Tr. 30.

Agent Harris stated that during the course of their entire investigation, officers never observed Oceguara having a legitimate job and that his trade was selling narcotics.  Tr. 11-12.  Further, officers knew that Mudgett had a previous narcotics conviction on his criminal record.  Tr. 12.  Officers also knew that Oceguara had a relationship with Mudgett's daughter and that they had one child together.  Tr. 19.

3

On August 2, 2011, officers intercepted another communication between Oceguara and Mudgett, at which time Oceguara asked Mudgett "do you need anything today or tomorrow" and Mudgett replied, "I'll meet with you tomorrow."  Tr. 17-18.

On August 8, 2011, following the interception of some phone calls and prior to the stop of Mudgett, officers observed Oceguara and Ramirez-Valdovinos meet at a Target and then travel in tandem to a bowling alley in White Bear Lake.  Tr. 13.  There, they encountered another known customer, defendant Duane Eugene Smith, who was waiting for them.  Tr. 13.  Officers observed Oceguara meet with Smith, walk over to Ramirez-Valdovinos's car, and then walk back to Smith's vehicle, at which time Ramirez-Valdovinos left.  Tr. 13.  Based on these observations, officers believed that Oceguara had obtained money from Smith, Oceguara provided the payment to Ramirez-Valdovinos who in return gave Oceguara narcotics, and then Oceguara provided the narcotics to Smith.  Tr. 13.  The interaction between Ramirez-Valdovinos and Oceguara lasted for about a minute, and was consistent with other narcotics transactions.  Tr. 13-14.

Approximately fifteen minutes after this interaction, officers intercepted a telephone call between Oceguara and Mudgett in which they discussed how much money Mudgett had and agreed to meet at 7:00 p.m.  Tr. 14.  Officers then intercepted a call between Oceguara and Ramirez-Valdovinos, in which Oceguara stated: "We're going to need another one of those like the one at the bowling alley. Meet us at seven o'clock at my father-in-law's off of Rice."  Tr. 15.  Officers assumed that the reference to Oceguara's father-in-law was Mudgett.  Tr. 19-20.

4

Officer's conducted surveillance and observed Oceguara's Jeep pull into the parking lot of the apartment located on McCarrons Boulevard and saw one of his associates, defendant Jesus Lopez-Vasquez, get out of the vehicle and wait in the parking lot.  Tr. 15.  A few moments later, officers observed Ramirez-Valdovinos arrive at the parking lot, followed by Mudgett shortly after.[2]  Tr. 15.  Like what they had observed in the parking lot at the bowling alley, within minutes officers saw Lopez-Vasquez meet with Mudgett, then meet with Ramirez-Valdovinos, and then go back and meet with Mudgett.  Tr. 15.  Next, officers observed Oceguara return to the parking lot in his Jeep and then approximately a minute later Ramirez-Valdovinos left the parking lot.  Tr. 15.  Oceguara, Mudgett and Lopez-Vasquez then went into the apartment complex.  Tr. 22, 28.

Officers maintained surveillance at the apartment complex at McCarrons Boulevard and approximately an hour-and-half-later, officers observed Mudgett get into his vehicle, a white GMC Jimmy, and leave the area.  Tr. 16, 22.  Surveillance officers followed Mudgett from the apartment complex.  Tr. 17.  Minnesota State Trooper Scott Schneider was contacted to make a walled-off traffic stop of Mudgett's vehicle and was told that they had reason to believe he had methamphetamine.  Tr. 17, 27.

Officers did not know what Mudgett had been doing during the time he was in the apartment complex and had no surveillance on the back of the apartment.[3]  Tr. 23, 24.

---

[2]      Mudgett arrived at 6:52 p.m.  Tr. 21.

[3]      Investigator Warren John Robinson testified that he went to the apartment complex at McCarrons Boulevard and observed a rear exit to the building, which was

Officers had no information as to where Mudgett was going.  Tr. 25.  No one saw anyone carry anything into the apartment complex, and no one saw Mudgett carrying anything when he left the complex.  Tr. 23, 25-26.  Nevertheless, Agent Harris believed that Mudgett would be carrying narcotics at the time of the traffic stop because of the phone call intercepted between Mudgett and Oceguara discussing price and narcotics, and the interaction in the parking lot of the apartment complex between a known source, a known drug dealer and known customer engaging in a short interaction consistent with a drug transaction.  Tr. 17.  Agent Harris did not know if the transaction took place in the parking lot or in the apartment complex.  Tr. 28.

Trooper Schneider testified that on August 8, 2011, he was contacted by DEA agents who told him that law enforcement had an individual under surveillance and that he was going to be picking up a large amount of methamphetamine and then later leaving an apartment complex in Roseville.  Tr. 35.  After the individual was seen leaving the apartment building, Trooper Schneider was told to stop the vehicle, make contact and seize the narcotics.  Tr. 35.

Trooper Schneider encountered the white sports utility vehicle, matching the description provided by the DEA, going eastbound on Highway 36 near the junction with Interstate 35E.  Tr. 36.  Trooper Schneider testified that he had been told by surveillance that the vehicle had already failed to signal a turn, a violation of Minnesota law, and he observed the vehicle traveling 62 miles per hour in a posted 55 miles-per-

---

not visible from the front.  Tr. 70.  He also saw a lake approximately a block away from the rear exit.  Tr. 70.

hour zone. Tr. 36. Both of these violations provided a valid basis to stop the vehicle and issue a citation or warning. Tr. 36.

Trooper Schneider activated his lights and stopped the vehicle on Highway 36 near the exit for White Bear Avenue. Tr. 37. Trooper Schneider made contact with the driver, Mudgett, and asked him for his license and Mudgett complied. Tr. 38. Trooper Schneider noticed that Mudgett's hand was shaking and asked him if he was all right. Tr. 38. Mudgett told Trooper Schneider that he was fine and that he was shaking because he had just been jogging by a lake. Tr. 38. According to Trooper Schneider, a shaking hand is a sign of being abnormally nervousness. Tr. 38.

Trooper Schneider also noted that Mudgett had a sweat ring on his T-shirt that ran from his neck to his nipple line, which was consistent with his story that he had been jogging, but also can be an indication of nervousness. Tr. 38-39. Trooper Schneider explained to Mudgett why he had been stopped and then returned to his squad car to contact DEA personnel to advise them of what he had learned. Tr. 39.

Trooper Schneider explained that he called the DEA agents because he wanted to confirm with them that they were certain that Mudgett was the subject of the investigation and the one they observed leaving the apartment. Tr. 39, 62-63. Trooper Schneider told the DEA agent that Mudgett claimed he had been running around the lake and that the sweat was consistent with running. Tr. 39-40. The DEA agent told

Trooper Schneider that they were sure that Mudgett had not just finished running around the lake and that he had come from the apartment.[4]  Tr. 40, 61.

Trooper Schneider approached the vehicle again with knowledge that he had been told that Mudgett had been involved in a drug transaction, he had observed signs of nervousness, he had been given a false story by Mudgett about running, and Mudgett had a past criminal record.  Tr. 40.

Trooper Schneider asked Mudgett to step out of the vehicle almost immediately after the traffic stop.  Tr. 40.  Mudgett was not handcuffed or restrained in any way, however, he was not free to leave.  Tr. 41, 64.  At one point Mudgett put his hand in his pockets, which caused Trooper Schneider to conduct a pat down for officer safety.  Tr. 41.  Trooper Schneider explained to Mudgett why he had performed the pat down.  Tr. 42.  No contraband was discovered during the pat down.  Tr. 41-42.  Mudgett was not restrained in anyway after the pat down.  Tr. 42.

After the pat down, Trooper Schneider asked Mudgett if he had a criminal record, and Mudgett responded that he had been arrested for a narcotics violation for which he was serving parole.  See Government Ex. 51, p. 9.

---

[4]     In the audio recording of the traffic stop, (Government Ex. 50), Trooper Schneider asked the DEA agents how positive they were that "this guy" was a customer, because he stated that he had been running around the lake and his shirt was dripping with sweat.  See Government Ex. 51 (transcription of the audio recording), p. 5.  Agents told him that they were positive Mudgett was a customer, and that he had just come out of the middle of the apartment where he had dropped off money and was supposed to have picked up dope.  Id.   Trooper Schneider then stated that his shirt was wet and the agent replied that he definitely was not running.  Id.

Trooper Schneider wrote out a formal warning for the two traffic violations and Mudgett was given the written warnings.  Tr. 42.  After the written warnings had been given to Mudgett, Trooper Schneider asked if he had any drugs or large sums of cash inside the vehicle, and Mudgett said no.  See Government Ex. 51, p. 11.  Trooper Schneider then asked for consent to search the vehicle or use his dog to search the vehicle.  Id., Tr. 42.  Mudgett refused consent, stating his kid was a pothead, and he might have some pot in the car.  Government Ex. 51, pp. 11-12; Tr. 42-43.  Trooper Schneider told Mudgett that he was going to walk his dog around the vehicle, regardless of his refusal to consent.  Government Ex. 51, p. 12; Tr. 43.  Trooper Schneider also told Mudgett that if his dog alerted to the odor of a controlled substance, that would give him probable cause to search the vehicle with or without consent.  Government Ex. 51, pp. 12-13. Trooper Schneider testified that Mudgett became very talkative, was stuttering and talking frantically.  Tr. 42.

According to Trooper Schneider, Mudgett's fast speech and nervousness was indicative of criminal activity.  Tr. 42.  Further, based on the statement by Mudgett that there could be pot in the vehicle, Trooper Schneider believed there could be narcotics inside the vehicle.  Tr. 43.

Trooper Schneider told Mudgett to stand by the light pole during the canine search.  Tr. 65; Government Ex. 51, p. 13.  Trooper Schneider testified that Mudgett not restrained, but he was not free to leave at this time.  Tr. 43, 64-65.

Suspecting that Mudgett was involved in criminal narcotic activity and that narcotics were inside the vehicle, Trooper Schneider utilized his certified narcotics

canine approximately 13 minutes after the stop. <u>See</u> Government Ex. 49; Tr. 44. The dog indicated the odor of narcotics in the front of the vehicle and alerted on the driver's front side. Tr. 45-46. Trooper Schneider asked Mudgett if there was any reason why the dog was alerting and Mudgett replied that either it was pot from his son or because of road kill, possibly a raccoon. Tr. 46; Government Ex. 51, p. 14. Another trooper arrived on scene, Trooper Hagen, and stood with Mudgett at the front of the vehicle while Trooper Schneider finished the search. Tr. 47. Mudgett was not restrained or under arrest at this time. Tr. 65.

Trooper Schneider located in Mudgett's vehicle a pouch on the floor behind the front passenger seat near the center console. Tr. 48. Trooper Schneider opened the pouch and found several baggies (totaling approximately one pound) containing a crystal substance that was consistent with methamphetamine. Tr. 49. At that point, Trooper Schneider decided to arrest Mudgett. Tr. 49. Mudgett fled officers and was eventually apprehended and handcuffed. Tr. 49-51.

## II.   ANALYSIS

### A.   <u>Motion to Suppress Evidence</u>

Mudgett argued that the evidence seized from his vehicle should be suppressed on the basis that "but for" constitutional violations by police, the dog sniff which led to the discovery of the contraband from his vehicle would not have occurred. <u>See</u> Defendant Todd Allen Mudgett's Post-Hearing Memorandum in Support of Motion to Suppress Statements and Evidence ("Def.'s Mem.") [Docket No. 510], p. 3. Mudgett conceded that the traffic violations gave Trooper Schneider probable cause to stop his

vehicle.  Id., p. 5.  In addition, Mudgett acknowledged that dog sniffs of the exterior of a

vehicle are not searches for the purposes of the Fourth Amendment.  Id.  Nonetheless,

Mudgett asserted that officers did not have probable cause to believe that he would be

transporting drugs in his vehicle the evening of the stop on August 8, 2012, when the

officers did not see him carrying anything when he left the apartment building, did not

know what had occurred inside the building, and did not know what he had been doing

during the hour-and-a-half period between his entry into and exit from the building.  Id.,

pp. 3-4.   In addition, Mudgett contended that surveillance officers violated the

constitution when they advised Trooper Schneider that he had drugs in his vehicle and

told Trooper Schneider to "roll the dice"[5] when he expressed doubt.  Id., pp. 4-5.

In sum, Mudgett submitted that Trooper Schneider's decision to perform a canine

sniff was the direct consequence of the constitutional violation because, but for the

misrepresentations by surveillance officers that he was transporting drugs and that he

---

[5]    The Court rejects Mudgett's suggestion that a surveillance officer told Trooper
Schneider to "roll the dice."   The dialog referenced by Mudgett was part of a
conversation between the surveillance officers, which is reflected on the audio recording
and follows after Trooper Schneider contacted the DEA agents to confirm that he had
stopped the right person.

> *[4:46]*
>
> *Mv4: The only reason I was asking, I just talked to Scott, guy
> said, uh, he was just jogging around the lake, and, he said
> he does look like he is sweating pretty good, but, so ...we're
> gonna... roll the dice here I guess, so...*
>
> *[Door slams]*

Government Ex. 51, p. 5.  From this excerpt, it is clear that the surveillance officer
referenced as "Mv4" had just spoken to Trooper Schneider and was not speaking with
Trooper Schneider.

had not been running, Trooper Schneider would not have conducted the dog sniff and would not have searched the vehicle.  Id., pp. 6-7.

The Government countered that was stop and search Mudgett's car was supported by probable cause and alternatively, was justified as a Terry stop, as it was supported by a reasonable and articulable suspicion of criminal activity.   See Government's Response to Defendant' Mudgett's Motion to Suppress Evidence [Docket No. 517] ("Govt. Mem."), pp. 7-12.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

"It is well established that a roadside traffic stop is a 'seizure' within the meaning of the Fourth Amendment."  United States v. Jones, 269 F.3d. 919, 924 (8th Cir. 2001). However, "a traffic violation – however minor – creates probable cause to stop the driver of a vehicle."  United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002) (citations omitted).  This is true even if a valid traffic stop is a pretext for another investigation.  Id. (citation omitted).

Mudgett conceded that he was speeding and therefore, Trooper Schneider had probable cause to stop his vehicle, regardless of whether the actual motivation for the stop was related to his purported drug activities.  Thus, the only question to resolve is whether Trooper Schneider's subsequent search of the vehicle violated the Fourth Amendment.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).  "One such exception is the automobile exception, which allows law enforcement to 'search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'"  United States v. Brown, 634 F.3d 435, 438 (8th Cir. 2011) (quoting United States v. Davis, 569 F.3d 813, 817 (8th Cir. 2009), quoting United States v. Cortez–Palomino, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam)). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Donnelly, 475 F.3d 946, 954 (8th Cir. 2007) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Additionally, if, "during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense." United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994) (en banc) (marks and citation omitted)), "[R]easonable suspicion [is] supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).  An officer must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch," and must have "a minimal level of objective justification for the intrusion" unrelated to the traffic offense.  Id. (marks and citation omitted).  The totality of circumstances may give rise to reasonable suspicion of criminal activity. See United

States v. Coleman, 603 F.3d 496, 500 (8th Cir. 2010) (citation omitted). The police officers' experience and their ability to recognize acts consistent with illegal activity may be considered in analyzing reasonable suspicion. Id.  Further, an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification. See United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005) (citation omitted).

This Court finds there was both probable cause and a reasonable, articulable suspicion that Mudgett's vehicle was carrying contraband to support the search of the automobile.

Before the stop and search on August 8, 2012, Trooper Schneider had been told by DEA agents that Mudgett had been involved in a narcotics transaction that day.  This information was based on: (1) an observed drug transaction between Oceguara, Ramierez-Valdovinos and Smith, another known drug customer, earlier that day; (2) a phone call between Mudgett and Oceguara intercepted 15 minutes after that transaction discussing price, narcotics and when and where to meet; (3) a subsequent phone call between Oceguara and Ramirez-Valdovinos referencing the transaction that had just occurred involving Oceguara, Ramierez-Valdovinos and Smith and setting up an encounter at Mudgett's apartment building at the same time as the meeting set to take place with Mudgett; and (4) the subsequent interaction that was consistent with a drug transaction which took place in the parking lot of Mudgett's apartment complex at the time set for the meeting (7:00 p.m.) with a known source of drugs (Ramirez-Valdovinos),

a known drug dealer (Oceguara and his associate, Lopez-Vasquez) and a known customer (Mudgett).

This information, coupled with observed signs of nervousness (including shaking and sweating) during Trooper Schneider's interaction with Mudgett, Mudgett's statement that there could be pot in the vehicle, and the subsequent canine alert for the presence of narcotics gave Trooper Schneider probable cause to believe that narcotics were present in the vehicle.  See United States v. Claude X, 648 F.3d 599, 602 (8th Cir. 2011) ("It is well settled law that a dog's alert during a canine search 'of a vehicle provides probable cause that drugs are present in the vehicle, thereby justifying a search of the vehicle.'") (quoting United States v. Mohamed, 600 F.3d 1000, 1004 (8th Cir. 2010), citing United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994) (en banc)).

Similarly, even if the officers could not attest to what had occurred in the McCarrons Boulevard apartment building during the intervening time from the alleged transaction in the parking lot to when Mudgett left the apartment complex, and even if Mudgett left the building empty-handed and had been jogging prior to the time he was stopped, the same facts supporting a finding of probable cause provided Trooper Schneider with reasonable suspicion that criminal activity may be afoot at the time he conducted the search of Mudgett's vehicle.  Prior to the stop, Trooper Schneider had been told by DEA agents that Mudgett had been involved in a drug transaction, at the time of the stop Mudgett displayed signs consistent with nervousness, Mudgett told

Trooper Schneider there might be pot in the car and the dog alerted for the presence of narcotics.

Evidence seized pursuant to a canine sniff can be suppressed if the canine sniff was the direct result of a constitutional violation.  <u>See</u> <u>United States v. Peralez</u>, 526 F.3d 1115, 1121 (8th Cir. 2007).  Here, however, there was no constitutional violation. The totality of circumstances, based on Trooper Schneider's observations and the information he received from the DEA and Mudgett prior to the dog search, gave Trooper Schneider ample reasonable suspicion that criminal activity may be afoot.[6]

---

[6]   Even if this Court had not concluded that the search was supported by probable cause or a reasonable suspicion that there was criminal activity afoot, the Court would still find that the evidence seized solely as a result of the traffic stop and subsequent dog sniff should not be suppressed.  A dog sniff "conducted during a traffic stop that is 'lawful at its inception and otherwise executed in a reasonable manner' does not infringe upon a constitutionally protected interest in privacy."  <u>United States v. Martin</u>. 411 F.3d 998, 1002 (8th Cir. 2005) (citing <u>Illinois v. Caballes</u>, 543 U.S. 405, 125 S.Ct. 834, 837 (2005)).  However, a dog sniff may be the product of an unconstitutional seizure "if the traffic stop is unreasonably prolonged before the dog is employed." <u>Id.</u>  "[W]hen a dog sniff occurs after a very short lapse of time from when the purpose of the traffic stop has been completed, there is a de minimis intrusion, and therefore, under the general rule of reasonableness, the stop does not violate the Fourth Amendment."  <u>Mohamed</u>, 600 F.3d at 1005 (citing <u>United States v. Alexander</u>, 448 F.3d 1014, 1016 (8th Cir. 2006); <u>United States v. Martin</u>, 411 F.3d 998, 1002 (8th Cir.2005); <u>United States v. $404,905.00</u>, 182 F.3d 643, 649 (8th Cir. 1999)).  "[R]easonable suspicion is not required for a canine search to be considered a de minimis intrusion on a driver's personal liberty."  <u>Mohamed</u>, 600 F.3d at 1005 (citations omitted).

In this case, the purpose of the traffic stop concluded once Trooper Schneider completed and then provided Mudgett with a copy of the written warning for the traffic violation.  Based on this Court's review of the video for the traffic stop, this occurred approximately at 9:12 minutes into the stop.  <u>See</u> Government Ex. 50.  At 12:19 minutes into the stop, Trooper Schneider brought out his dog and began the sniff around the vehicle. <u>Id.</u>  At 13:37 minutes into the stop, Trooper Schneider asked Mudgett why his dog was alerting to the front of the vehicle.  <u>Id.</u>  As such, a little over three minutes passed from when the written warning had been given to Mudgett and when the dog sniff began and was completed about a minute later.  The traffic stop was lawful, and

For all of these reasons, the Court concludes that Mudgett's motion to suppress evidence seized from the search of his vehicle should be denied.

### B. <u>Motion to Suppress Statements</u>

Mudgett argued that when Trooper Schneider stopped him on August 8, 2011, he was effectively detained from the time of his traffic stop and was at no point free to leave, thereby entitling him to a <u>Miranda</u> warning prior to any questioning from police. <u>See</u> Memorandum in Support of Motion to Suppress Statement and Evidence ("Def.'s Mem.") [Docket No. 500], p. 3. No such warning was administered to him. Consequently, Mudgett maintained that all statements made by him to Trooper Schneider and Trooper Hagen on August 8, 2011 must be suppressed. <u>Id.</u>, pp. 3-4. The Government disagreed, contending that because Mudgett was not in custody, but rather was detained for investigative purposes until he was arrested, no <u>Miranda</u> warning was required. Gov't. Mem., pp. 12-16. Mudgett did not address his motion to suppress statements in his post-submission memorandum to the Court.

<u>Miranda v. Arizona</u> requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>see</u> <u>also</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990).

the canine search constituted a de minimis intrusion on Mudgett's liberty. <u>See</u> <u>Mohamed</u>, 600 F.3d at 1005 ("Trooper Frisby completed the canine search within five minutes of concluding a lawful stop. Trooper Frisby did not unreasonably extend the seizure of Mohamed by prolonging the seizure by five minutes to conduct a canine search."); <u>Alexander</u>, 448 F.3d at 1016-17 (concluding that a canine sniff was a de minimis intrusion when it occurred four minutes after the completion of a lawful traffic stop).

Therefore, the protections afforded by <u>Miranda</u> are triggered when an individual "is both in custody and being interrogated."  <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995) (<u>citing</u> <u>United States v. Lawrence</u>, 952 F.2d 1034, 1036 (8th Cir.), <u>cert. denied</u>, 503 U.S. 1011 (1992)).  "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  <u>Miranda</u>, 384 U.S. at 444.

When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during the questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere of the questioning was police dominated;  and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>Griffin</u>, 922 F.2d at 1349;[7] <u>see also</u>, <u>e.g.</u>, <u>United States v. Axsom</u>, 289 F.3d 496 (8th Cir. 2002).  The first three factors are considered "mitigating factors" which, if found, tend to

---

[7]      This Court notes that some Eighth Circuit decisions have not applied the <u>Griffin</u> factors in a formulaic manner.  <u>See</u>, <u>e.g.</u>, <u>United States v. Ollie</u>, 442 F.3d 1135, 1137

show that the suspect was not in custody.  Griffin, 922 F.2d at 1349.  The remaining three factors are characterized as "coercive factors" which, if found, tend to show the existence of custody.  Id.

The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody."  Griffin, 922 F.2d at 1347 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  Moreover, the determination is based on the totality of the circumstances, with none of the factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  Id. at 1347.  The ultimate inquiry is whether there was a formal arrest or restraint on a defendant's movement of the degree associated with a formal arrest.  Stansbury v. California, 511 U.S. 318, 322 (1995).

Significant to this Court's analysis, as a general rule "the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop does not constitute Miranda custody."  Maryland v. Shatzer, 559 U.S. ----, 130 S.Ct. 1213, 1224, 175 L.Ed.2d 1045 (2010) (internal citation omitted); see also United States v. McGauley, 786 F.2d 888, 890-91 (8th Cir. 1986) (citing Berkemer v. McCarty, 468 U.S. 420 (1984)) ("No Miranda warning is necessary for persons detained for a Terry stop.").

_____

(8th Cir .2006).  However, the Eighth Circuit continues to examine the Griffin factors in its analysis of custody.  See, e.g., United States v. Elzahabi, 557 F.3d 879, 883 (8th Cir. 2009).

The Court finds that Mudgett was not subjected to a formal arrest or restraint on his freedom of movement to the degree associated with a formal arrest during the stop and prior to his arrest.  When Mudgett was pulled over based on the traffic stop, he was almost immediately asked to step outside of the vehicle.  However, the fact that Mudgett was detained outside of his automobile for a traffic violation did not automatically place him in custody for the purposes of <u>Miranda</u> warnings.   As the Supreme Court recognized in <u>Berkemer</u>:

> [A]t the outset . . . a traffic stop significantly curtails the "freedom of action"' of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so.

468 U.S. at 436 (footnote and internal citation omitted).  On the other hand, "questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." <u>Id.</u> at 437-438. Further, "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces." <u>Id.</u> at 437.  These include the public nature of the traffic stop and

the fact that "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in <u>Miranda</u>" and its progeny.  <u>Id.</u> at 438-39 (footnote and citation omitted).

Here, while Mudgett was detained outside his vehicle prior to his arrest, at no time was he physically restrained during the stop and Trooper Schneider's investigation. Further, although a pat down search occurred, it was done for officer safety, it was brief and did not result in any further limitation on Mudgett's freedom of movement.  There were no strong-arm tactics or deceptive stratagems employed during questioning and Mudgett voluntarily responded to questions.  The atmosphere was not police-dominated given that the questioning of Mudgett took place on the side of a public highway and in the presence of one or two officers. <u>Id.</u> at 438 ("This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability.").  Mudgett was ultimately arrested, however, this occurred only after a dog alerted to the presence of narcotics in the vehicle and the officers discovered the narcotics.

Based on the totality of the circumstances, the Court finds that Mudgett was not in custody for the purposes of <u>Miranda</u>, and therefore, no warning was required. Therefore, suppression of any statements he made by him to Trooper Schneider on August 8, 2011 is not warranted

## III.   **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein,

**IT IS RECOMMENDED THAT:**

Todd Allen Mudgett's Motion to Suppress Statements and Evidence [Docket No. 499] be **DENIED**

Dated:  February 22, 2012

s/ <em>Janie S. Mayeron</em>

JANIE S. MAYERON<br>United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 29, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **February 29, 2012**.